The document below is hereby signed.

Signed: September 24, 2018

_S. Martin Teel, Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
MAX E. SALAS,                  )      Case No. 18-00260
                               )      (Chapter 11)
            Debtor.            )
                               )      **Not for Publication in**
                               )      **West's Bankruptcy Reporter.**

MEMORANDUM DECISION AND ORDER
<u>RE OBJECTION TO HOMESTEAD EXEMPTION</u>

The debtor, Max E. Salas, has claimed an exemption under

D.C. Code § 15-501(a)(14) of the real property located at 1610

Riggs Place, NW, Washington, D.C. (the "Property") even though he

is not the record owner of the Property in the District of

Columbia land records.  For the reasons stated below, I will

overrule the pending objection to the claimed exemption of the

Property.

I

FACTS

On June 3, 2015, Michael Patrick McLoughlin and Nina

Brekelmans, two roomers at the Property, were killed in a fire at

the Property.  The parents of McLoughlin and Brekelmans, as

personal representatives of their children's estates brought

actions in the Superior Court of the District of Columbia

(respectively the McLoughlin plaintiffs in Case No. 2015 CA

008054 B and the Brekelmans plaintiffs in Case No. 2015 CA 008061

B), pursuing wrongful death and survivorship claims against both

the debtor, Max Salas, and one of his sons, Len Salas.[1]  Their

actions were later consolidated as a single action and, on April

4, 2018, the McLoughlin plaintiffs and the Brekelmans plaintiffs

obtained jury verdicts in the Superior Court of $7.7 million and

$7.5 million, respectively, against Max and Len, jointly and

severally.  On April 18, 2018, Max filed a petition commencing

this case under Chapter 11 of the Bankruptcy Code (11 U.S.C.) and

Len filed a petition in the United States Bankruptcy Court for

the Middle District of Tennessee (Case No. 3:18-bk-02662)

commencing his own case under chapter 11 of the Bankruptcy Code.

Max claimed an exemption on the Property and the plaintiffs

timely objected to that exemption.

---

[1]  I will refer to the debtor and his family members by
their first names for ease of discussion.

2

A.    Events Preceding the Transfer to Len of Record Title to
      the Property

The events relevant to the disposition of the objection to

Max's exemption claim began in 1995, when Vickie L. Bruff (later

Vickie Salas) purchased the Property, with Max making the $80,000

down payment.  Vickie bought the Property because Max had

financial and credit problems that prevented him from obtaining a

mortgage to purchase the Property.  Thereafter, Max and Vickie

began living at the Property, with Max making the mortgage

payments.  Max has resided at the Property since 1995, except for

when he was forced to live elsewhere temporarily after the fire

pending the restoration of the Property.

Max married Vickie on March 1, 2002.  In April 2007, they

decided to get divorced.  In contemplating a divorce agreement,

Max wanted to keep the Property as his home and Vickie wanted to

realize cash out of the Property.  They determined that if Vickie

transferred the Property to Max and Max refinanced the mortgage,

he could pay Vickie her share of equity in the Property and

otherwise retain the Property.  This plan could not be carried

out because Max's poor credit record would have impeded him from

refinancing the mortgage on the Property upon the conveyance of

the Property to him.  However, they realized that if the Property

were transferred to Max's son, Len, Len would be able to

3

refinance the mortgage and pay Vickie the cash to which she was entitled under the divorce arrangement.

Vickie, Max, and Len took a series of steps to achieve that goal on April 16, 2007: Vickie conveyed the Property to Max pursuant to a deed duly recorded in the District of Columbia land records; in turn, Max conveyed the Property to Len pursuant to a deed similarly recorded in the land records;[2] Len then obtained a loan from SunTrust whereby any previously existing liens were eliminated and a new mortgage, a deed of trust, in favor of SunTrust, was recorded to secure repayment of the promissory note for the loan; and, finally, proceeds received by Len incident to the refinancing were then used to pay Vickie the cash to which she was entitled under the divorce agreement.  Each deed recorded indicates that consideration of $10 was paid for the transfer of the Property.  As a result of these transactions, title to the Property, according to the land records, was in Len's name.

---

[2]  Apparently a transfer directly from Vickie to her stepson, Len, would have triggered a D.C. transfer tax whereas neither the transfer from Vickie to her husband, Max, nor the transfer from Max to his son, Len, was subject to a transfer tax.

B.   Residence in and Management of the Property by Max and
Len After April 16, 2007, and Prior to the Signing of
the Trust Documents

Len represented in the loan documents that the Property

would serve as his sole residence for at least a year, and that

he would maintain the Property.  Nevertheless, Len and Max agreed

that the Property would, in actuality, remain Max's home.  In

accordance with this, Len treated Max as the real owner of the

Property.  Indeed, Len paid Max rent when Len and his girlfriend

(later his wife) lived in the house for approximately six to

eight months after the transactions with Vickie closed.

Max and Len also agreed that Max would make the mortgage

payments even though only Len was an obligor on the note secured

by the deed of trust.  There is no writing evidencing an

agreement to that effect, but the existence of that agreement is

demonstrated by that fact that over the years Max alone made all

monthly mortgage payments.  Len made none of the payments, even

though he on occasion did receive communications from SunTrust

whenever a payment was missed.[3]  Similarly, Max has paid for all

other expenses associated with the Property, including amounts

incurred for utilities, real property taxes, insurance,

maintenance, and general upkeep.  Accounts associated with the

---

[3]  At some point, Len gave Max authority to deal with
SunTrust regarding the mortgage.

5

Property have been established in Max's name, including all
electric and water utility accounts, cable and internet accounts,
and a Deluxe-Home insurance policy for the Property with
Encompass Insurance Company of America ("Encompass").[4]  None of
the leases entered into with roomers at the Property ever listed
Len as the lessor, and Len never executed any of the leases.  The
roomers viewed Max as the landlord.  Max and Len never told them
that Len was the owner of the Property.

> C.   Conflict between Max and Len Regarding Len's
>      Obligations under the SunTrust Loan

Max and Len contemplated that within a few years after Len's
execution of the promissory note in favor of SunTrust on April
16, 2007, Max would have an improved financial status enabling
him to take steps to eliminate Len's financial obligations in
relation to the Property.  The existence of the SunTrust debt in
Len's name was an impediment to Len's ability to obtain financing
to purchase real property for his own use.  Over the years, Len
contacted Max to urge Max to take steps to eliminate his
responsibility for the debt owed SunTrust secured by the
Property.  Max told Len that he was working with SunTrust to

---

[4]   Real estate tax records maintained by the District
reflect Len as the owner of the Property, but Len never paid the
real estate taxes.  Max's payments to SunTrust included amounts
that SunTrust used to pay real estate taxes regarding the
Property.

6

replace Len as the obligor on the debt, but such efforts did not succeed.  Len's wife, Karen, nagged Len continually regarding eliminating Len's obligations under the SunTrust debt.  Len hoped his father would sell or refinance the Property and thereby eliminate Len's obligations regarding the Property.  The issue was increasingly a sore point for Len.

D.    Creation of the 1610 Riggs Property Trust and Attempted Transfer of Ownership

Because of Max's income tax liabilities, Max's credit was shot and he could not get refinancing for the Property to remove Len as the obligor.  Max thought, based on discussions with Sylvia Jones, an acquaintance who was active in real estate transactions, that transferring the Property to a trust in his favor might make refinancing the Property easier than placing title to the Property in his own name: a business entity with no credit record would have a better chance of success in obtaining financing than would Max, an individual with a bad credit record. Max also may have been concerned that transferring title to the Property directly to himself would create a risk of the outstanding income tax liens against him being enforced against the Property.  In 2010, Max, Len, and Karen spent the July 4th holiday in Colorado with Ron Salas, Max's eldest son.  Ron had recently graduated from law school and had begun practicing law

in Colorado.  On July 6, 2010, Max, Len, Karen, and Ron met at

Ron's office.  Using Colorado legal forms, Ron prepared (or had

already prepared) an *Irrevocable Trust Agreement* and a *Quitclaim*

*Deed*.

At the July 6, 2010 meeting, Len executed the *Irrevocable*

*Trust Agreement* as "Len Salas, Grantor," and Max executed it as

"Max Salas, Trustee."  Karen and Ron witnessed the execution of

the document and Lori King, a notary public, certified that Max

and Len executed the document before her.  The *Irrevocable Trust*

*Agreement* purports to create a trust named the 1610 Riggs

Property Trust ("the Trust"), and recites that the Grantor (Len)

"desiring to create a trust for the benefit of his father and for

other good and valuable consideration, irrevocably assignees

[sic] to the Trustee the [Property], in trust, for the purposes

and on the conditions hereinafter stated."  The *Irrevocable Trust*

*Agreement* names Max as the sole trustee and the sole beneficiary

of the Trust and makes clear Len's intent to grant Max complete

authority regarding management of the Property and the sole right

to enjoy income generated by the Property, with, for example, the

right to sell or encumber the Property.

At the same meeting, Len and Max (as Trustee of the Trust)

executed the *Quitclaim Deed*, which Lori King notarized as

executed before her.  The *Quitclaim Deed* recites:

8

THIS QUITCLAIM DEED, Executed this 6th day of July, 2010, by first Len Salas whose post office address is 1859 Newton St. Unit B, Washington, DC 20010 to second party, 1611 Riggs Property Trust whose post office address is 155 E Boardwalk, Suite 300, Fort Collins, CO 80525.

WITNESSETH, That the said first party, for good consideration and for the sum of $100.00 paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said second party forever, all the right, title, interest and claim which the said first party has in and to the following described parcel of land, and improvements and appurtenances thereto in the County of Denver [sic], District of Columbia, to wit:

**Real Property**

| Common Address | Legal Description |
|---|---|
| 1610 Riggs Pl NW<br>Washington, DC 20009 | Square: 0178<br>Suffix:<br>Lot: 0030<br>Neighborhood: Old City II<br>Sub-Neighborhood: D<br>Use Code 24 |

Despite the mis-description of the Trust in the *Quitclaim Deed* as the 1611 Riggs Property Trust, the entire transaction, including Max's execution of the *Quitclaim Deed* as "Trustee, 1610 Riggs Property Trust" and the terms of the *Irrevocable Trust Agreement* reciting that the Property was being transferred into the 1610 Riggs Property Trust, of which Max was to be the Trustee, makes clear that the *Quitclaim Deed* was conveying the property to the 1610 Riggs Property Trust.

E.   Max's Failure to Record the *Quitclaim Deed*

Max originally intended to record the *Quitclaim Deed* around the time of its creation.  Before doing so, he sought the legal services of Stan Goldstein and his title company.  Max was counseled that because the *Quitclaim Deed* transferred the Property from Len to a trust, the recordation of the *Quitclaim Deed* would require payment to the District of Columbia of transfer and recordation taxes.  Though he desired to eliminate Len's financial obligations in regard to the Property, because he could not obtain a refinancing at that time, Max decided that there was no present reason to record the *Quitclaim Deed* and incur the resulting transfer and recordation taxes.  Because Max lacked sufficient funds at the time to pay such taxes, he chose to wait to record the *Quitclaim Deed* until he, as trustee, sought to sell or refinance the Property to make the Trust the obligor under a new mortgage.  Max never intended to sell the Property and remains uninterested in doing so.  However, since the execution of the *Quitclaim Deed* and continuing through today, he has continually and unsuccessfully desired and sought to refinance the SunTrust mortgage via obtaining a new loan.  Accordingly, Max never recorded the *Quitclaim Deed*.  He merely stored copies of the executed documents at the Property with other personal files.

F.    Len's Understanding of the Impact of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*

Len understood the *Irrevocable Trust Agreement* and the *Quitclaim Deed* as papers Max needed in order to attempt to refinance the SunTrust debt.  After executing those documents, Len continued to treat Max as the true owner of the Property.  He did not recall afterwards that his execution of those documents had conveyed title to the Property to the Trust.  Len never checked with Max to see if the *Quitclaim Deed* had been recorded, and his involvement regarding the Property after July 2010 was only periodically checking with Max regarding efforts to remove Len from the Property mortgage debt.  His focus was not on removing himself as an owner of the Property in the land records.

After the July 6, 2010, meeting, Len put his copies of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* in a file cabinet.  He eventually forgot that he had received copies and put them there, and, indeed, completely forgot about the execution of those documents, as did his wife.

G.    Inability to Refinance the Debt Preceding the Fire

Len's focus was on eliminating his indebtedness to SunTrust, but it became clear that was not going to occur without a sale of the Property because of the inability of Max, alone, to refinance the debt.  In early 2015, Len and Max supplied information

concerning their finances to SunTrust for an application for refinancing.  Under the terms of the proposed refinancing, Len would have remained the obligor on the debt but the mortgage would have had a more favorable interest rate for Max to pay. The existing note called for interest-only payments at 6% per annum, and the refinancing that Max and Len sought would have been in the form of a conventional 30-year mortgage that would call for a lower interest rate, and that would include amortizing payments of principal.  However, they did not succeed in obtaining such refinancing.

H.   Max's Leasing of Rooms in the Property and the Entity
      Known as CLR, Inc.

Prior to 2009, Max had a company, CLR, Inc., that he used in running food businesses, and had BB&T bank accounts in that corporation's name.  The letters "CLR" are the first letters of the first names of Max's three sons, Chase, Len, and Ron.  Max hoped that CLR, Inc.'s businesses eventually would be successful and the CLR, Inc. bank accounts would contain considerable sums of money that he could transfer to his three sons.  However, those businesses never became a success, and CLR, Inc.'s charter was revoked in 2009.

By 2010, Max, who had already been renting out the basement of the Property for years, began leasing two of the five bedrooms

in the Property to roomers while continuing to live at the
Property himself.  Once Max began renting to roomers, he used one
of the CLR, Inc. BB&T bank accounts for depositing rents received
from the roomers, and used those deposits to make the mortgage
payments on the Property.  BB&T insisted that all deposited rent
payment checks indicate CLR as the payee.  Accordingly, Max
drafted leases to indicate that the lessor was "Max Salas (CLR)
Landlord" or "Max Salas CLR Landlord" with the leases directing
that payments be made to "Max Salas (CLR)" or "Max Salas CLR."

     I.    The Superior Court Action Against Max and Len by the
         McLoughlin Plaintiffs and the Brekelmans Plaintiffs

On June 3, 2015, almost five years after execution of the
*Irrevocable Trust Agreement* and the *Quitclaim Deed*, the fire in
which McLoughlin and Brekelmans were killed occurred at the
Property.  Their parents, as representatives of their respective
children's estates, filed complaints commencing the Superior
Court actions against Max and Len on October 20, 2015, before Max
had completed his medical treatments related to his physical
injuries resulting from his escape from the fire.  The two
separate cases were later consolidated as a single action.

The basis for the McLoughlin plaintiffs and Brekelmans
plaintiffs suing Len was that he was the record owner of the
Property.  If Len, who played no role in the management of the

13

Property, could show that he had conveyed ownership to Max before the fire occurred, there would be no basis upon which Len could be liable to the plaintiffs.

Remarkably, Max and Len failed to recall for many months in the course of the Superior Court action, until a few weeks before the trial began in March 2018, the formal papers they had executed to establish the Trust and to convey title of the Property to the Trust. However difficult it is initially to view without skepticism the testimony of Max and Len regarding their forgetting about the existence of the documents executed on July 6, 2010, I credit that testimony. They had no reason to hide the existence of the documents; indeed, they had every reason to disclose the documents so that Len would not be held liable, as owner of the Property, to the plaintiffs. The circumstances demonstrate that their testimony is credible.

Len is highly unsophisticated in financial and legal matters. The Trust was created in 2010 at Max's instigation, not Len's. Len knew at the time he executed the documents that he was signing papers that might help his father obtain refinancing for the Property, but he failed to recall, when sued in 2015, that the documents he had executed on July 6, 2010, had been intended to effect a transfer of the Property from him to the Trust, with the consequence of terminating his ownership of the

14

Property.   Before he executed the *Irrevocable Trust Agreement* and
the *Quitclaim Deed* in 2010, he already viewed Max as the true
owner of the Property, and, from his perspective, formalizing
Max's ownership via the execution of those documents was not
altering anything.   When sued in 2015, Len simply did not
appreciate the legal significance of the *Irrevocable Trust
Agreement* and the *Quitclaim Deed* he had executed in 2010.

Max is somewhat unsophisticated in legal and financial
matters, albeit not to the extent that Len is.   However, Max also
suffers from depression, anxiety, and memory loss problems, due
in part to the traumatic effects of the fire of June 3, 2015.
Max was severely injured escaping from the fire, suffering burns
and a broken ankle, and spent six weeks hospitalized.   Even upon
his release from the hospital, Max was unable to move back into
the Property because it required restoration from the fire
damage.   Pending restoration of the Property, he lived in an
apartment paid for by his insurance company, but he always
intended to return to living in the Property once he was able to
do so.   He was in convalescence at the apartment and suffered an
infection that required him to receive drip antibiotics for three
months, and was heavily sedated during that time.   Afterwards, he
lived with home care for some time.   Max also suffered from the
emotional trauma of having the two young roomers killed in the

15

fire in his home.  He did not return to work for eight months after the fire (approximately February 2016).  The restoration of the Property was completed in March 2018, at which point he moved back into the Property.

Shortly after the filing of the plaintiffs' complaints in the Superior Court, Max and Len each discussed with Ron the existence of the pending litigation.  Max had counsel supplied by his insurance company in the Superior Court litigation, but the insurance company did not supply Len with counsel.  Ron advised Len to obtain counsel, which he did.  Ron was chary of meddling in the handling of the litigation by the attorney that Len would hire.  For that reason, Ron did not mention to Len the existence of the documents executed in July 2010 (the *Irrevocable Trust Agreement* and the *Quitclaim Deed*), as the handling of Len's defense would be by Len's counsel in the litigation, and Ron assumed that such counsel would provide competent advice to Len. Ron also had personal troubles involving the death of his son that distracted his attention and he did not stay abreast of developments in the litigation.

Max, in the answers to the Superior Court complaints he served on November 2, 2015, and November 5, 2015, indicated that Len was the owner of the Property and that he managed the Property for the owner.  Len similarly served answers indicating

16

that he technically was the title owner of the Property but

denying that he was an operator and/or property manager.

However, at the start of the litigation, before the trust

documents were found, Max revealed that he believed the Property

to be held in trust for his benefit, and Len revealed that he

viewed Max as the true owner of the Property (as had always been

the case).

In answers to interrogatories served on November 17, 2015,

Max made this response:

> INTERROGATORY NO. 3: If you contend that some other
> person or entity was the real owner or manager of the
> property in question, located at 1610 Riggs Place, NW,
> Washington, DC, identify that entity.
>
> ANSWER: Defendant contends that some other person is the
> owner of the property in question.  Defendant does not
> know the identity of the owner, but believes the same to
> be a trust known as 1610 Salas Trust.

In answers to interrogatories served on November 30, 2015, Len

filed this response:

> INTERROGATORY NO. 3: If you contend that some other
> person or entity was the real owner or manager of the
> property in question, located at 1610 Riggs Place, NW,
> Washington, DC, identify that entity.
>
> ANSWER: Defendant contends that Max Salas was the real
> owner and the manager of the property in question.

In a deposition of February 24, 2016, in the Superior Court

litigation, Max was asked about the 1610 Salas Trust to which he

had referred in his answers to interrogatories.  His answers

17

demonstrate his confusion about the trust that he believed owned the Property, not an attempt to hide anything.  Max, at first, took the position that nobody but he owned the Property when asked about his interrogatories answers that a 1610 Salas Trust was the owner of the Property.  But then when asked who and what the 1610 Salas Trust was he said: "I don't know--I mean it's a trust that--there's a trust called CLR, CLR Trust, it's our trust."  Max said the trust was for him and his sons.  Deposition of Max Salas (Feb. 24, 2016) [hereinafter "Max Dep."] at 42. However, there never was a CLR Trust; there was only a corporation of that name, CLR, Inc., that Max had hoped would eventually contain funds he could give his sons.  Importantly, Max then stated: "There is a 1610 Trust doing business as CLR." Max Dep. at 43.

This is consistent with Max's testimony in this court regarding how he had rent checks paid to him.  Additionally, the lease with Brekelmans, executed on August 14, 2014, was signed by Max as "Agent/Land Lord/Agent" but his title was indicated to be "Trustee."  Her rental payments, as all other rental payments Max received by renters, were deposited into CLR, Inc.'s bank account.  But during the deposition for the Superior Court action, Max could not recall any important information regarding the trust.  When asked when the trust was created, he did not

18

know; when asked who was the trustee of the trust, he said he
believed he was but was not sure; when asked who was the
beneficiary of the trust, he said he thought it was his property;
and when asked if there was a written trust agreement signed by
anyone, he said he did not know.

Later in the deposition, when asked about the reference to
CLR on leases he had entered into with roomers, Max said he used
that designation "because I was depositing the money in the trust
account named like this," Max Dep. at 89, and then this testimony
ensued:

> Q  You had a trust account in the name of CLR Trust?
>
> A  Yes.  There's a -- yes.
>
> Q  That's the name of the account?
>
> A  I'm not sure it's the name of the account.  I
>    think it's called 1610 Riggs Place Trust.

*Id.*  Even later in the deposition Max was asked about CLR again
and said: "It is a corporation and then there was a trust in the
corporation's name I think."  Max Dep. at 209.  This varying
testimony demonstrated Max's confusion as to the corporate
entity, CLR, Inc., and its associated bank accounts, one of which
was used for deposits of rent, and the Trust.

As to what Max referred to in the deposition as the CLR
Trust, but what was actually CLR, Inc., he explained that it was

19

set up to protect him from liability, and identified an attorney,
David Fernandez, who he had not seen in ten years (which would
have been in 2006, before Vickie Salas ceased to be the owner of
the Property in 2007 and long before the execution of the
*Irrevocable Trust Agreement* and the *Quitclaim Deed* on July 6,
2010), as the one who set up and handled the incorporation of
CLR.  The intent was that Max, as the owner of CLR, Inc., would
have protection from personal liability for the debts of the
corporation.  This explains why Max referred to a CLR entity as
protecting him from liability.

Max then indicated that the entities he referred to as the
"1610 Salas Trust" and the "CLR Trust" were not separate trusts.
Rather, he testified, there was only one trust, and the bank
account for the rental checks went to a trust account (which, at
that time in the deposition, he mistakenly thought the bank
called "1610 Salas").

The bottom line is that during his deposition for the
Superior Court action, and for a long time afterwards, Max
vaguely recalled there being some trust that held an interest in
the Property, and at times remembered a trust with a name similar
to the actual name of the Trust ("1610 Riggs Property Trust") but
he was unable to recall any details establishing the existence of
the Trust.  He also confused the Trust with CLR, Inc.

20

This continued to be the case even as late as (or shortly before) February 9, 2018.  In the *Amended Joint Pretrial Statement* filed in the consolidated Superior Court actions on February 9, 2018, both Max and Len conceded that Len was the title owner of the Property but noted that Len had taken title to enable Max to continue to reside in the Property and exercise all indicia of ownership (and recited the ways in which Max acted as owner of the Property).  Len disputed that he was a property manager of the Property or had any possession, control or authority of the Property; disputed that he owed any duty to the tenants of the Property "as he [was] merely the bare **record** owner of the property;" and disputed "that he received any benefit from his bare title ownership of the [Property]."  *Amended Joint Pretrial Statement* at 10-11 (emphasis added).

Late in the Superior Court litigation, the attorney that the insurance company had hired for Max suggested that Max ought to consider hiring a separate attorney to represent his interests. Max contacted Ron for advice in hiring an attorney.  Ron suggested that Max consider hiring a bankruptcy attorney in case he needed to utilize the protections afforded by bankruptcy, and gave Max the names of several attorneys in the District to consider.

21

Max employed Marc E. Albert.  Albert reviewed Max's deposition testimony that a trust owned the Property. Albert asked Max about that testimony, and pointed out to Max that the creation of any trust would have entailed the execution of a written document.  He pressed Max as to whether there was some written document he had executed regarding a trust.  That finally triggered Max's memory that in July 2010 he had executed the documents relating to the Trust at Ron's office.  Max notified Ron that Albert planned to call him to request copies of the documents relating to the Trust.  When Albert called Ron, Ron located his electronic copies of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* as of February 14, 2018, and sent them to Albert.  Len was also provided Ron's copies of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*.[5]

On March 19, 2018, in advance of the Superior Court trial set for March 26, 2018, Len filed an *Emergency Motion for Summary Judgment* ("*Emergency Motion*") in the Superior Court litigation based on the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*, in which his counsel explained the delay in filing the *Emergency Motion* by saying: "the discovery of this

---

[5]  Len stumbled upon his copies of the documents by accident only a week before the trial in the Superior Court, but by then copies from Ron had already been supplied to the plaintiffs.

22

document occurred very recently and [Len] has filed this motion
as quickly as possible given its discovery and investigative work
to ensure that it is legitimate." *Memorandum in Support of
Defendant Len Salas's Emergency Motion for Summary Judgment* at 9.
However, on the day of the trial, the Superior Court declined to
grant the *Emergency Motion*, and in doing so did not take evidence
as to whether there was an explanation for the delay in the
*Irrevocable Trust Agreement* and the *Quitclaim Deed* coming to
light.  The Superior Court barred presentation of evidence
regarding the *Irrevocable Trust Agreement* and the *Quitclaim Deed*
in the jury trial.  The court's decision rested on various
reasons, including that:

- the *Emergency Motion* was "filed untimely" (Transcript
  of Proceedings (Mar. 26, 2018) [hereinafter "Tr. Day
  1"] at 5);

- in "the exercise of reasonable diligence" in complying
  with discovery obligations, Len should have disclosed
  the existence of the Trust far earlier (Tr. Day 1 at
  6), and allowing Len to contradict his earlier position
  would "impose an unfair detriment" on the plaintiffs
  and allow Len to derive "an unfair advantage" (Tr. Day
  1 at 12), such that Len was judicially estopped from
  altering, late in the litigation, his earlier position

23

that he had legal title to the Property at the time of
the fire (Tr. Day 1 at 6, 10-13);

- the Superior Court had "a serious question as to
whether a trust actually exists"  (Tr. Day 1 at 6)
because Max was both the sole trustee and the sole
beneficiary and a trust terminates when the legal
interest and beneficial interest under the trust are
vested in one person (Tr. Day 1 at 6-7, 12); and

- raising the "late issue" of whether Len should be a
party to the case right before trial "seemed to be a
business decision that was made by the insurance
company with regard to settlement of the case," and
Len's raising the issue by the *Emergency Motion*
appeared to be "a strategy, if you will, to have Mr.
Len Salas divested of any title and, therefore, of any
responsibility when it comes to defending this case and
as to any . . . adverse verdict that might render" (Tr.
Day 1 at 7-8), such that presentation of the defense
was barred by "the circumstances surrounding this whole
theory involving Mr. Len Salas" (Tr. Day 1 at 8).

The Superior Court did not take evidence regarding whether there
was any explanation for the late production of the *Irrevocable
Trust Agreement* and the *Quitclaim Deed*, and did not hear from Max

24

Salas or his counsel in regard to Len's *Emergency Motion*.  Max
(who had no standing as a defendant to move for an adjudication
of his ownership of the Property as, regardless of that issue, he
could be found liable on the basis of his management of the
property) did not respond to Len's *Emergency Motion*, and was not
asked by the Superior Court to address the issue of the Trust.

The Superior Court orally supplemented its ruling of March
26, 2018, the next day, noting as to the last point that "indeed,
this Court was confronted with, in my view, the untenable
position that the insurer for the defendant had made a business
decision, and that was to, essentially, provide coverage for Max
Salas, but not Len Salas, and this was the theory, okay?"  and
stated: "Insurance companies do not direct the Court in matters
of this nature.  And so I can't speak to what negotiations or
arrangements are made outside of this Court . . . ."  Transcript
of Proceedings (Mar. 27, 2018) [hereinafter "Tr. Day 2"] at 340-
41.

Based on Len's belated disclosure of the *Irrevocable Trust
Agreement* and the *Quitclaim Deed*, the plaintiffs had filed a
motion in the Superior Court for leave to amend their complaints
to add the Trust as a party.  The Superior Court heard that
motion at the same time as it heard the *Emergency Motion for
Summary Judgment.*  The attorney for the Brekelmans plaintiffs

25

requested that "the Court sever" the claim that the title was

divested to the Trust and that the trial proceed with "no mention

of the trust." Tr. Day 1 at 15. Similarly, the attorney for the

McLoughlin plaintiffs indicated that:

> the best course of action is just to delay adjudication
> of this motion until after trial on the current complaint
> as it existed before we filed the leave to amend. And
> then we can take that up after, if necessary, after trial
> and just -- we don't even need to reach the issue at this
> point in time.

Tr. Day 1 at 16-17. The Superior Court indicated to Len's

attorney that Len "would stand to benefit from the Court's ruling

acknowledging the existence of a trust and, therefore, relieving

[Len] of any responsibility to defend or indemnify if the -- or

to be responsible for an adverse judgment." Tr. Day 1 at 19.

The Superior Court granted (or the clerk of the Superior

Court understood the Superior Court to have granted) the

plaintiffs' motion for leave to amend their complaints,[6] but

agreed to defer ruling definitively on the issue of whether a

---

[6]  The docket entry for March 26, 2018, in the McLoughlin
case, Case No. 2015 CA 008054 B, reads: "Oral Ruling GRANTING
Plaintiffs' Emergency Motion to Amend Their Complaints to add as
a Defendant' 1610 Riggs Property Trust in open court by Judge
Holeman Entered on the Docket 3/26/2018." Similarly, the docket
entry for March 26, 2018, in the Brekelmans case, Case No. 2015
CA 008061 B reads: "Plaintiffs Motion to Amend the Complaint is
GRANTED and stayed as to all proceedings against the trust."
However, neither the dockets nor the portions of the transcript
offered as evidence by the plaintiffs show that an order was
entered to that effect.

trust existed.[7]  Tr. Day 1 at 18.  The trial went forward only as

to Max and Len, not as to the Trust, and Len was not permitted to

present evidence regarding the existence of the Trust.  Pursuant

to a jury verdict, Len, as the record owner of the Property, was

held jointly and severally liable with Max for the damages that

the plaintiffs recovered pursuant to the judgments of April 4,

2018.  That led to Max and Len commencing their bankruptcy cases

on April 18, 2018.  The Superior Court has not yet entered a

certification under Superior Court Rule of Civil Procedure 54(b)

to make the judgments against Max and Len final and appealable.[8]

---

[7]  At the trial on March 27, 2018, the Superior Court
stated: "That issue, whether or not a trust exists, and anything
flowing from that, will be taken up, if necessary, following this
case, as I articulated yesterday."  Tr. Day 2 at 338.

[8]  By an order in this bankruptcy case entered on July 20,
2018, disposing of a motion for relief from the automatic stay
filed by the plaintiffs, this court authorized the plaintiffs and
Max:

> to take the necessary steps in the Superior Court
> Litigation to the extent necessary to make the Judgments
> final, enforceable, and appealable through certification
> of the Superior Court for the District of Columbia
> pursuant to D.C. Superior Court Rule of Civil Procedure
> Rule 54(b), or, if the Superior Court is not willing to
> grant certification under that rule, through continuation
> of the Superior Court Litigation to dispose of claims
> against 1610 Riggs Property Trust . . . .

II

DOCTRINES OF ESTOPPEL AND RES JUDICATA

The plaintiffs rely on principles of judicial estoppel, collateral estoppel (issue preclusion), and res judicata (claim preclusion) in objecting to the claimed exemption.

A.   Judicial Estoppel

"Courts may invoke judicial estoppel '[w]here a party assumes a certain position in a legal proceeding, . . . succeeds in maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position.'" *Comcast Corp. v. FCC*, 600 F.3d 642, 647 (D.C. Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted)). *See also Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 792 (D.C. Cir. 2010) (quoting *Comcast Corp. v. FCC*, 600 F.3d at 647).  The issue of ownership in the Superior Court trial was only pertinent to whether Len could be held liable. Max, having managed the Property, was liable regardless of who owned the Property.  Max was not attempting to succeed on a position that Len was the owner of the Property: he had no desire to have his own son held liable to the plaintiffs.  It was the plaintiffs who were attempting to hold Len liable as owner of the Property, not Max.  Max cannot be viewed as succeeding in the

Superior Court based on taking a position that Len, not Max, owned the Property.

Max made clear early on in the Superior Court that he believed the Property was held in trust for him, but for years he could not recall the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*. When, late in the litigation, Albert pressed Max on Max's belief that a trust existed and pointed out that such a trust would entail an executed trust instrument, Max recalled that Ron had prepared documents that Max and Len had executed. That led to locating the *Irrevocable Trust Agreement* and the *Quitclaim Deed*. When that in turn led to Len's *Emergency Motion for Summary Judgment* which disclosed to the Superior Court the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*, Max did not contest the existence of those documents. He would have been delighted had Len's *Emergency Motion for Summary Judgment* been granted, and Len had been held not liable to the plaintiffs.

The *Amended Joint Pretrial Statement* in Superior Court, filed before the *Irrevocable Trust Agreement* and the *Quitclaim Deed* were located, offered a stipulation of fact that at "the time of the occurrence, Len Salas held legal title to the building." *Amended Joint Pretrial Statement* at 9. However, the *Amended Joint Pretrial Statement* went on to note Len's contention

that he was "merely the bare record owner of the property" and
Len's disputing that he "had any possession, control or authority
at the Property," or that he "received any benefit from his bare
title ownership of the property."   *Amended Joint Pretrial
Statement* at 10-11.  Accordingly, when the *Amended Joint Pretrial
Statement* is viewed as a whole, the stipulation that Len "held
legal title" to the Property refers to the fact that at the time
of the occurrence, as well as now, Len's interest in the Property
was limited to being the displayed record owner for the Property
in the land records, and is entirely consistent with Max's
position that he is the true owner of the Property, and thus
entitled to exempt the Property.

Even if the stipulation could be viewed as Max's taking a
position contrary to the position that Max takes now, Max later
acted consistently with his current position by providing the
information that led to the *Irrevocable Trust Agreement* and the
*Quitclaim Deed* being uncovered in Ron's office.  Max did not
oppose Len's *Emergency Motion for Summary Judgment* which sought
to show that Len should not be held liable as the owner of the
Property.  Max's conduct in the Superior Court demonstrates that
he was not attempting to succeed in the Superior Court on a
position that Len is the owner of the Property, and is consistent
with the position he has taken in this court that he is the true

30

beneficial owner of the Property, through the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed*, and entitled to claim the Property exempt.[9]

B.   Collateral Estoppel (Issue Preclusion)

The doctrine of collateral estoppel is also known as issue preclusion, and the doctrine:

> renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum.

*Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995) (quoting *Washington Med. Ctr. v. Holle*, 573 A.2d 1269, 1283 (D.C. 1990)). *See also Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394 (D.C. 2006). In the Superior Court, Max, as the manager of the Property, was

---

[9]   The plaintiffs have not invoked equitable estoppel, and plainly that doctrine would be inapplicable. "A party raising equitable estoppel must show that he changed his position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with knowledge of the true facts and intent to induce the other to act. *Cassidy v. Owen*, 533 A.2d 253, 255 (D.C. 1987)." *Nolan v. Nolan*, 568 A.2d 479, 484 (D.C. 1990). Max had no intent to cause the plaintiffs to act based on any representation that legal title was in Len: Max wanted Len off the hook. Nor was there any knowingly false representation: Max recalled there was a trust but did not recall the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* until late in the litigation. Moreover, the plaintiffs did not rely on the stipulation in the *Amended Joint Pretrial Statement* to their prejudice.

liable regardless of whether he owned the Property or not, and thus a finding that he lacked ownership was not necessary to hold him liable.  A finding in that regard was *not* "essential to the judgment" against Max, and thus the judgment against Max cannot be given collateral estoppel effect on the issue of ownership of the Property.

The determination that Len owned the Property *was* "essential to the judgment" against Len.  However, Max was not a party to the claims against Len.  Max was liable regardless of whether Len was liable, and he had no standing to defend against the claims against Len.  In that sense, he was a non-party regarding the claim against Len and Len's legal rights in that regard.

As a nonparty to the judgments against Len, Max, unless an exception applies, is entitled to the protection of "the general rule that a litigant is not bound by a judgment to which she was not a party."  *Taylor v. Sturgell*, 553 U.S. 880, 898 (2008); *see also Richards v. Jefferson County*, 517 U.S. 793, 798 (1996).  Only the privity exception is of possible relevance to that general rule.

Under the privity exception, the judgment against Len cannot apply to Max unless Max was in privity with Len.  As stated in *Modiri*, 904 A.2d at 396-97:

"A privy is one so identified in interest with a party to

the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." [Quoting *Smith v. Jenkins*, 562 A.2d 610, 615 (D.C. 1989).] The "orthodox categories" of privies are "'those who control an action although not parties to it . . .; those whose interests are represented by a party to the action . . .; [and] successors in interest." *Id.* (quoting *Lawlor v. National Screen Serv.*, 349 U.S. 322, 329 n. 19, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)). 18 Moore's Federal Practice § 132.04[1] [b][iv] at p. 132-148 (defining the three types of "sufficiently close" relationships that establish privity as 1) a successor to a party's property interest; 2) a nonparty that controlled the original suit; and 3) a nonparty whose interests were represented in the original suit).

(Footnote omitted).

The tort claims against Len are not the same cause of action as Max's claim of ownership of the Property. However, for issue preclusion purposes, an "issue" is not limited to a "cause of action." *Jackson v. District of Columbia*, 412 A.2d 948, 953 (D.C. 1980). Accordingly, privity could apply.

Nevertheless, the three categories of the privity exception enumerated in *Modiri* do not apply to Max. First, the facts do not show that collateral estoppel applies on the basis that Max is "a successor to a party's property interest." That latter exception applies to successors who acquired their interest in property after the commencement of the litigation leading to the

33

judgment declaring ownership of property.[10]  Max is asserting an

ownership interest already in existence when the Superior Court

action began, and the Superior Court action was not one by Len to

establish that he owned the Property but instead was the

plaintiffs' action to find Max and Len liable on tort claims.[11]

Second, Max did not control the defense of the claims

against Len: Max had counsel supplied by the insurance company,

and that counsel was not defending Len, who had separate counsel.

Third, Len did not represent Max with respect to any ownership

claim Max might make to the Property.  As noted by the Court in

*Taylor*, 553 U.S. at 894 "'in certain limited circumstances,' a

---

[10]  *See* Restatement (Second) of Judgments § 43 (discussing
effect of judgment regarding property on a later successor to the
property, and noting in *Comment a* thereto that a determination
adjudicating title to property "is carried over upon
succession"); Restatement (Second) of Judgments § 44 (discussing
effect of judgment regarding property on an entity to whom an
interest in the property is conveyed during the pendency of the
litigation leading to the judgment).  *See*, *e.g.*, *Diversified Fin.
Sys., Inc. v. Boyd*, 678 N.E.2d 308, 311 (Ill. App. 1997) ("Where
the transferor becomes a party to an action concerning property,
after it has been transferred, his becoming a party 'does not
make him in any sense a representative of his successor in
estate.'  Restatement (Second) of Judgments § 44, Comment *f*, at
12 (1982).").

[11]  One other point regarding privity, when property law is
at issue, is that privity "denotes a mutual or successive
relationship to the same rights of property."  *District of
Columbia Redevelopment Land Agency v. Dowdey*, 618 A.2d 153, 163
(D.C. 1992), quoted in *Modiri*, 904 A.2d at 396 n.4.  Len and Max
did not stand in mutuality regarding ownership of the Property:
Max's ownership of the Property would negate the existence of any
mutual interest of Len in the Property.

nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." (Quoting *Richards*, 517 U.S. at 798). Representatives under the Restatement (Second) of Judgments § 41(1) are restricted to five specific categories: trustees, persons authorized by the nonparty, executors, authorized public officials, and class representatives designated by a court. However, privity may be based on "adequate[] representation" of the "same interests" in other circumstances.

In *Franco v. District of Columbia*, 3 A.3d 300, 306 (D.C. 2010), the court viewed with favor the Supreme Court's rejection in *Taylor* of the doctrine of "virtual representation," observing:

> The Supreme Court has rejected any broad doctrine of virtual representation that would allow preclusion based on identity of interests and relationships between parties and non-parties without due process protections such as those prescribed for class actions under Fed. R. Civ. P. 23. *Taylor*, 128 S. Ct. at 2176. In disapproving the theory of virtual representation under review in *Taylor*, the Supreme Court cited among its reasons: (1) the importance of discrete exceptions to non-party preclusion in light of "the fundamental nature of the general rule that a litigant is not bound by a judgment to which she was not a party"; (2) the limitations on non-party preclusion based on adequate representation which requires, at a minimum, an alignment of interests between the party and non-party and the party's understanding that he or she was acting in a representative capacity or the first court took steps to protect the non-party's interest, and sometimes notice of the original suit to those purportedly represented; and (3) the preferability of definite rules to avoid unnecessary complication generated by preclusion

questions under a balancing approach.  *Id.* at 2175-77
(citations omitted).

Len was not representing Max's interests with respect to Max's

claim of ownership of the Property, and given the posture of the

claims in the Superior Court, there is no evidence that Len

understood himself to be representing Max's interests in that

regard.  Nor did Max view Len as representing Max's ownership

interest.  They each had separate counsel.[12]  Accordingly, the

third of the categories of the privity exception enumerated in

*Modiri* does not apply to Max.

More fundamentally, as in *Lassiter v. District of Columbia*,

447 A.2d 456, 462 (D.C. 1982), the question is whether Max "had a

'full and fair' opportunity in the first trial to litigate to a

final judgment the issue raised in the second suit.  *See*

*Blonder-Tongue Laboratories, Inc. v. University of Illinois*

*Foundation*, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d

788 (1971); *Jackson v. District of Columbia*, D.C.App., 412 A.2d

948, 953 (1980)."  As stated in *Allen v. McCurry*, 449 U.S. 90, 95

(1980), "one general limitation the Court has repeatedly

---

[12]  Max's ownership interest was not an issue as to whether
Max was liable (as he was already liable based on managing the
Property) and Max's insurance-company-supplied-counsel's
representation of Max did not include representation as to Max's
ownership claim, so Max never had occasion to litigate his claim
of ownership in the Superior Court.

recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case."  (Citations omitted).  In that regard, collateral estoppel ought not apply when a party "may have little incentive to defend vigorously, particularly if future suits are not foreseeable."  *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 330 (1979).  In determining whether a party had a "full and fair opportunity" to litigate an issue, "the decision will necessarily rest on the trial courts' sense of justice and equity."  *Blonder-Tongue*, 402 U.S. at 333-34.  Moreover, "the *Parklane* requirement that the defendant in the first action have incentive in that action to litigate the lawsuit fully and vigorously also mandates conflict-free representation of issues sought to be precluded."  *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1140 (5th Cir. 1991) (citing *Parklane Hosiery Co.*, 439 U.S. at 652).

Here, Max's insurance company supplied counsel for Max, but the insurance policy only related to defending Max regarding liability, not ownership of the Property.  Regarding the view that collateral estoppel does not apply to issues not actually litigated, the Restatement (Second) of Judgments § 27, Comment e notes:

37

> Sometimes the party against whom preclusion is asserted
> is covered by an insurance policy and represented by
> insurance company counsel in the prior action but not in
> the subsequent action.  In such instances, preclusion
> with respect to unlitigated issues seems particularly
> unfair.

This case well illustrates the wisdom of not according issue

preclusion to an issue that insurance-company-supplied-counsel

did not litigate because it was immaterial to such counsel's

representation of the insured.  The existence of the Trust was

immaterial to the issue of Max's liability, and was thus not a

topic germane to Max's insurance-company-supplied-counsel's

defense of him as to liability in the Superior Court litigation.

Moreover, Max's insurance company's interests diverged from Max's

with respect to Max's claim of ownership: it was in the insurance

company's interest for Len to be held liable.  If the plaintiffs

made collections from Len, that might reduce the amount that the

insurance company would have to pay.  Early in the Superior Court

litigation, Max's counsel in that litigation ought to have

alerted Max regarding the need for independent counsel regarding

Max's claim of ownership, and the divergence of the insurance

company's interests and Max's in that regard.  Not until late in

the litigation did Max's insurance-company-supplied-counsel

suggest that Max should consider employing independent counsel.

When the insurance-company-supplied-counsel belatedly

suggested that Max hire independent counsel, Max hired Marc
Albert.  It was Albert's making a probing inquiry of Max
regarding whether trust papers were ever executed that led to the
discovery of the *Irrevocable Trust Agreement* and the *Quitclaim
Deed*.  Max had no standing to take a position on the *Emergency
Motion for Summary Judgment*, and at the argument on that motion,
the Superior Court did not ask Max to state his position on that
motion.  Moreover, Max never had an opportunity to explain the
reasons for his delay in uncovering the *Irrevocable Trust
Agreement* and the *Quitclaim Deed*.  In addressing and ruling on
Len's *Emergency Motion*, the Superior Court heard no evidence as
to whether Max could explain reasons for the delay, and the
Superior Court barred presentation of evidence regarding the
*Irrevocable Trust Agreement* and the *Quitclaim Deed* in the
Superior Court jury trial.  Here, in contrast, Max has explained
the reasons for the delay.  I find his explanation is credible
and I find that the *Irrevocable Trust Agreement* and the *Quitclaim
Deed* have existed and have an impact on whether Max owned the
Property.  In these circumstances, my "sense of justice and
equity" (*see Blonder-Tongue,* 402 U.S. at 333-34) is that Max has
not had a "full and fair opportunity" (*see Allen v. McCurry*, 449
U.S. at 95) to litigate the issue of his ownership of the
Property.

39

Moreover, under *Parklane*, 439 U.S. at 330, the lack of foreseeability bars preclusion.  Max was not reasonably in a position (until he hired independent counsel) to foresee that his ownership of the Property (including Max's right to exempt the Property) could be affected by Len being held liable as the owner of the Property in the Superior Court litigation.  The court in *Tutt v. Doby*, 459 F.2d 1195, 1200 (D.C. Cir. 1972), stated "the principle of collateral estoppel is not properly applicable 'to unlitigated issues underlying default or consent judgments . . . unless it could be said that the parties could reasonably have foreseen the conclusive effect of their actions."  Moreover, "[e]ven where issues have been litigated, the criterion of foreseeability serves to limit the estoppel effect of the first judgment."  *Id.* at 1200 n.5.

The foregoing analysis is supported by *Casco Indem. Co. v. O'Connor*, 755 A.2d 779, 782-83 (R.I. 2000), the only decision I have found dealing with issue preclusion when there was a failure of insurance-company-supplied-counsel to warn the insured that the insured might need to consult with independent counsel.  In *Casco*, the court stated:

> Although the legal standard governing collateral estoppel is clear, "it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results."  *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).  To avoid

unfairness, courts have declined to apply collateral estoppel in situations in which the doctrine would lead to an inequitable result. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552, 561 (1979) (noting that it would be unfair to apply collateral estoppel "[i]f a defendant in the first action is sued for small or nominal damages, [because] he may have little incentive to defend vigorously, particularly if future suits are not foreseeable"). Of particular importance to the case at bar is the principle that "collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Allen v. McCurry*, 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308, 313 (1980).

In *Casco*, 755 A.2d at 783-84, Kevin O'Connor, as a driver of a car owned by Carol Interlini, was involved in a two-car collision with another driver, Melissa Defelice. O'Connor was considered an additional insured under Interlini's insurance policy with Casco Indemnity Company (Casco) with respect to the accident. When Defelice (who was uninsured) sued O'Connor, Casco hired defense counsel for O'Connor. While Defelice's suit was proceeding, O'Connor (through independent counsel) filed a written claim for personal injuries against Casco, pursuant to the uninsured motorist provision of the policy. Defelice's suit went to arbitration. When an arbitration award was issued, defense counsel acted contrary to O'Connor's interests: she did not provide him with a copy of the arbitrator's award, never informed him that he had a right within 20 days to reject the

41

arbitration award, never told him that the arbitration award could or would have an impact on his own uninsured motorist claim against Casco, and never informed O'Connor's independent counsel about the arbitration award. The arbitration award went to judgment, and in the litigation of O'Connor's uninsured motorist claim against Casco, the judgment pursuant to the arbitration award was invoked by Casco as collateral estoppel against O'Connor. The Supreme Court of Rhode Island held:

> Although defense counsel was hired and paid by Casco, O'Connor was her client, and she owed him unswerving loyalty during the course of her representation. . . . . Even if defense counsel reasonably believed that it was beyond the scope of her engagement to inform O'Connor of the possible preclusive effect that the arbitrator's award might have on his uninsured motorist claim, she should have advised him to consult with Donelan before deciding whether to accept or reject the award. *Cf. DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 769-72 (R.I. 2000) (discussing an attorney's obligation to disclose potential conflicts of interest). Defense counsel's failure to inform or consult O'Connor concerning the arbitrator's award denied O'Connor the opportunity to have the issue of his negligence fully litigated. Had O'Connor been given a copy of the arbitrator's award and had he been advised to discuss that award with his own attorney, he might have exercised his right to timely reject the arbitrator's award and insist that Defelice's suit be tried. At trial, the findings concerning the relative liability of the parties might have been substantially different.

*Id.* Accordingly, the Supreme Court of Rhode Island held that collateral estoppel did not apply.

Here, in a situation similar to *Casco*, Max's insurance-

company-supplied-counsel in the Superior Court ought to have recognized early on that Max's claim of ownership of the Property through a trust presented a matter (separate from the issue of whether Max could be held liable to the plaintiffs) as to which Max should obtain independent counsel.  The insurance company's interests potentially diverged from Max's.  However, the insurance-company-supplied-counsel waited until late in the litigation to advise Max that he might want to have independent counsel.  Had Max been advised to discuss the litigation with independent counsel early on, the existence of the *Irrevocable Trust Agreement* and the *Quitclaim Deed* might have come to light much sooner, and the outcome in the litigation on the issue of whether Len owned the Property might have been different.  Max ought not suffer a loss of the Property arising from the consequent delay in his obtaining independent counsel.

Moreover, for collateral estoppel to apply there must be a final judgment.  The judgments in the Superior Court are not final because the Superior Court has not adjudicated the claims

the plaintiffs are pursuing against the Trust.[13]  An order is
generally not final for collateral estoppel purposes where the
order may not be appealed.  *Davis*, 663 A.2d at 503.  "A final
judgement is defined as a prior adjudication of an issue in
another action that is determined to be sufficiently firm to be
accorded conclusive effect."  *Johnson v. Capital City Mortg.
Corp.* 723 A.2d 852, 856 (D.C. 1999) (quoting *Kleinbart v. United
States*, 604 A.2d 861. 864 (D.C. 1992)) (internal quotes omitted).
Preclusive effect should not be given to tentative judgments.
*Id.*

Under Sup. Ct. Civ. R. 54(b), any order or decision "that
adjudicates fewer than all the claims or **the rights and
liabilities** of fewer than all the parties does not end the action
as to any of the claim or parties and may be revised at any time
before the entry of a judgment adjudicating all the claims and
all the parties' rights and liabilities."  (Emphasis added).
Because the court has not decided or acted on the motion for
leave to amend the complaint to add the Trust as a party, the

---

[13]  As noted previously, it is not clear whether the
Superior Court granted the plaintiffs' motions for leave to amend
the complaint to add the Trust as a party.  Either way, claims
against the Trust are being pursued by the plaintiffs, and the
judgments against Max and Len cannot yet be treated as final for
purposes of res judicata (claims preclusion) and collateral
estoppel (issue preclusion).

judgment against Len is not a final judgment.

In addition, not all of Len's rights and liabilities had been adjudicated, including Len's right to seek indemnity from the 1610 Riggs Property Trust, as the true title holder of the Property.  The Superior Court specifically recognized that Len "would stand to benefit from the Court's ruling acknowledging the existence of a trust and, therefore, relieving [him] of any responsibility to defend or indemnify if the -- or to be responsible for an adverse judgment."  Tr. Day 1 at 19.  The attorney for the Brekelmens' estate specifically requested that "the Court sever" the claim that the title was divested to the Trust and that the trial proceed with "no mention of the trust."  Tr. Day 1 at 15.  The Superior Court deferred ruling on whether the Trust could be the title owner of the Property.  There was no holding that the Trust is not a legal entity that holds title to the Property by a *Quitclaim Deed* properly executed by Len.  The court held only that Len was the record title holder of the Property for purposes of the trial regarding liability for the deaths of Michael Patrick McLoughlin and Nina Brekelmens.

C.   Res Judicata

Res judicata, also known as claim preclusion, is the doctrine that "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 40 U.S. 147, 153 (1979).  "Whether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Drake v. F.A.A.*, 29 F.3d 59, 66 (D.C. Cir. 2002) (quoting *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984).

This doctrine is easily dismissed as these cases are not from the same cause of action.  The Superior Court case involved the liabilities of Len in a civil wrongful death and survivorship action, whereas this case is regarding Max's right under D.C. Code § 15-519(a)(14) to exempt the Property in his bankruptcy. The only possibility of res judicata coming into play is if there were privity between Len and Max, but as already discussed in the section on collateral estoppel, there is no privity in this case. Also, as already discussed, there is not a final judgment.  For all theses reasons, I do not find res judicata applicable here.

III

CONVEYANCE OF THE PROPERTY

The plaintiffs contend that should the court find that the doctrines of judicial estoppel, collateral estoppel, or res

judicata do not apply to this case, then the conveyance of the Property never occurred because the Trust was a nullity *ab initio*, under the law of the District of Columbia and Colorado, and the *Quitclaim Deed* was defective with a typo referring to the "1611 Riggs Property Trust."  For the reasons stated below, I reject the plaintiffs' contentions.

### A.   Conflict of Laws: District of Columbia Law Applies

The court must first determine whether District of Columbia or Colorado law controls before the court proceeds to determine whether a valid transfer took place.  A federal court must apply the choice of law principles of the state in which it is located. *Klaxon Co. V. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  The District of Columbia's conflict of laws analysis is governed by the Restatement (Second) of Conflict of Laws.  *Pearce v. E.F. Hutton Group, Inc.*, 664 F. Supp. 1490, 1495-96 (D.D.C. 1987).  Under the Restatement (Second) of Conflict of Laws § 278 "the validity of a trust of an interest in land is determined by the law that would be applied by the courts of the situs."  The law of the situs also governs conveyance transfers of an interest in land and the nature of any interest.  Restatement (Second) of Conflict of Laws § 223.

The District of Columbia has also adopted the "governmental interest analysis" approach.  *Williams v. Williams*, 390 A.2d 4, 5

(D.C. 1978).  However, the District has also modified the

"government interest analysis" approach to include the "most

significant relationship" approach and has adopted the

observation that "the state with the 'most significant

relationship' should also be that whose policy would be advanced

by application of [its] law." *Estrada v. Potomac Elec. Power

Co.*, 488 A.2d 1359, 1361 n.2 (D.C. 1985).

The *Irrevocable Trust Agreement* provides that Colorado law

would apply.[14]  However, the court does not find that provision

controlling.  The District of Columbia will enforce choice-of-law

provisions "so long as there is some reasonable relationship with

the state specified." *Norris v. Norris*, 419 A.2d 982, 983 (D.C.

1980).  The relationship here is not reasonable when considering

the totality of the circumstances.  As will be further discussed

below, Colorado had very little connection to the parties, and no

connection to the Property at all.  Additionally, Ron admitted

that he used a Colorado stock form to prepare the agreement.  He

further admitted that there was no particular reason to use

---

[14]   The *Irrevocable Trust Agreement* provides:

14    SITUS.  This trust has been executed and delivered
      in the State of Colorado and shall be construed and
      administered according to the laws of Colorado.  In
      witness whereof the Grantor and the Trustees have
      executed this Agreement in Colorado.

Colorado law over District of Columbia law and he did not
research the law of either Colorado or the District of Columbia,
or know of any difference between the laws of the two
jurisdictions.

All of this evidences that it was not a deliberate choice to
choose Colorado law over District of Columbia law.  For all these
reasons, the court does not find a sufficiently reasonable
relationship with Colorado, nor an intent from the parties, that
Colorado law should govern a land conveyance transaction that
would take place in the District of Columbia.

As noted above, the District of Columbia follows the
Restatement (Second) of Conflict of Laws.  Under the Restatement
§ 278, the validity of a trust regarding an interest in land is
governed by the law of the situs.  The Property is real property
located in the District of Columbia, not Colorado, and
accordingly, District of Columbia law applies.  Additionally, the
conveyance of real property is governed by the law of the situs.
The *Quitclaim Deed* was executed and delivered in Colorado, but
the Property is located in the District.  Accordingly, District
of Columbia law applies to the conveyance of the Property.

The court would come to the same conclusion if the court is
required to apply the "governmental interest" and "most
significant relationship" tests, as adopted and applied by the

49

District.   The only connection Colorado has to the *Irrevocable Trust Agreement* is that the attorney who wrote the instrument is a bar member in Colorado, and the *Irrevocable Trust Agreement* and *Quitclaim Deed* were executed and delivered in Colorado.   On the other hand, the Property was located, and both Len and Max lived, in the District.

Because the *Irrevocable Trust Agreement* governed neither property nor people located in Colorado, Colorado would likely have either no interest or an extremely limited interest in the validity or the effect of the Trust.   On the other hand, the District had a far greater interest governing the types of trusts that may exist and own property within the District's jurisdiction where the District is the collector of property taxes and its laws govern the use and maintenance of the Property.

The 2015 fire is a useful example of the District's interest regarding the Property.   It was a violation of the District's laws that contributed to the deaths of two residents of the District in the 2015 fire.   It was the District's fire department that put out the fire, and the District's streets that were blocked by the events surrounding the fire.   Additionally, it was other property located in the District that was threatened by the fire.   It was the District's courts that handled and resolved

liability suits related to the fire.

For the same reasons mentioned above, the District has a superior interest over the conveyance of the Property. Accordingly, the court holds that the law of the District of Columbia governs the formation of the Trust and the conveyance of the Property.

B.   Validity of the Trust

D.C. Code § 19-1304.03 provides that:

A trust not created by will is validly created if its creation complies with the law of the jurisdiction in which the trust instrument was executed, or the law of the jurisdiction in which, at the time of creation:

(1)   The settlor was domiciled, had a place of abode, or was a national;

(2)   A trustee was domiciled or had a place of business; or

(3)   Any trust property was located.

This means that the Trust would be valid if it is valid either in Colorado or the District of Columbia. Under Colorado law, at the time the Trust was created, a trust would terminate if the entire beneficial interest and the entire legal interest fell upon the same person. *Denver Found. v. Wells Fargo Bank*, 163 P.3d 1116, 1125 (Colo. 2007) ("When the entire beneficial interest of a trust is held by the same person or entity that holds the entire legal interest, the trust terminates under the doctrine of

merger; in other words, if the sole beneficiary also functions as the sole trustee, the trust ceases to exist."). The District of Columbia is in agreement with Colorado on this issue. D.C. Code § 19-1304.02(a)(5) provides that a trust can only be created if "[t]he same person is not the sole trustee and sole beneficiary." The Trust is therefore clearly invalid. Max was the sole trustee and the sole beneficiary of the Trust. Such a trust could never exist under Colorado or District of Columbia law, and a fortiori, the Trust could never have been formed. Accordingly, the court finds that the 1610 Riggs Property Trust never existed and was a nullity *ab initio*.

C.   Validity of the Conveyance of the Property

However, just because the court finds that the Trust never existed, does not mean that the conveyance failed from the beginning. Section 19-1304.03 only addresses what can and cannot constitute a trust. It does not address, however, what happens when parties attempt to convey property to a trust that is a nullity under § 19-1304.03. In the District of Columbia,[15] the conveyance of property through an invalid trust results in a

---

[15]   It was necessary to review Colorado law to determine whether a valid trust had been formed under D.C. Code § 19-1304.03; however, Colorado law would not control the effect of an invalid trust in conveying legal and beneficial interests in this case.

resulting trust, unless there is consideration, in which case,
the legal and beneficial rights are conveyed to the intended
beneficiary of the conveyance. *Kemp v. Eiland*, 139 F. Supp. 3d
329, 340 (D.D.C. 2015) (citing Restatement (Third) of Trusts § 8
cmt. f); *see also Smith v. Washington*, 226 A.2d 335, 339 (Md.
1967) ("*When there is a consideration for the conveyance, and it
is made upon a trust which is void for uncertainty, or otherwise
fails, then the grantee takes the beneficial interest.*")
(emphasis in original); *Rosenthal v. Miller*, 129 A. 28, 30 (Md.
1925) ("Where there are certain trusts, created either by will or
deed, which fail in whole or in part, or which are of such an
indefinite nature, either as to the purposes or beneficiaries,
that courts of equity will not carry them into effect, or which
are illegal in their nature and character, a resulting trust will
arise to the party creating the trust, or to his heirs and legal
representatives, as the case may be. . . . 'When there in a
consideration for the conveyance, and it is made upon a trust
which is void for uncertainty or otherwise fails, then the

53

grantee takes the beneficial interest.'" (citations omitted)).[16]

There are a couple of issues here.  There is an issue of whether Max provided consideration to Len for the conveyance of the Property.  The *Quitclaim Deed* states:

> WITNESSETH, That the said first party, for good consideration and for the sum of $100.00 paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said second party forever, all the right, title, interest and claim which the said first party has in and to the following described parcel of land . . . .

Thus, the *Quitclaim Deed* provides that a consideration of $100 was paid by Max to Len for the Property.  The plaintiffs did not provide any evidence to contradict the *Quitclaim Deed*, and, therefore, the court finds that consideration was paid.

The next issue is whether $100 is valuable consideration to allow the Property to convey to Max.  *See Smith*, 226 A.2d at 340. The court finds that $100 was valuable consideration, even though $100 is a nominal amount when considered against the value of the Property, because Len paid consideration of $10 when Max deeded the Property to Len in 2007.  In effect, Len purchased the

---

[16]   The court may appropriately look to Maryland law because "the common law of the District of Columbia encompasses all common law in force in Maryland in 1801, unless expressly repealed or modified."  *United States v. Jackson*, 528 A.2d 1211, 1215 (D.C. 1987); *see also* D.C. Code § 45-401(a).  "Maryland authorities expounding the common law of that state constitute powerful precedent in this jurisdiction . . . ."  *Little v. United States*, 709 A.2d 708, 711 (D.C. 1998).

Property for $10 in 2007 and sold the Property for $100 three
years later in 2010.

Additionally, while the mortgage was in Len's name, Max made
all payments on the mortgage, and there was an agreement between
Len and Max that Max would take Len's name off the mortgage when
Max was able to refinance the Property on his own credit.
Moreover, Max paid all bills, taxes, and other expenses related
to the Property, and maintained and kept up the Property.  Len
put no investment into the Property, and got more out of the
Property than he put into it.  Accordingly, the court finds that
there was valuable consideration.

There is also an issue of whether the *Quitclaim Deed* is
valid for misspelling the Trust's name as "1611 Riggs Property
Trust."  This was clearly a scrivener's error.  The *Quitclaim
Deed* makes clear that Len was transferring the Property to the
1610 Riggs Property Trust, with the correct address of "1610
Riggs Pl NW" and the title next to Max's name as "Trustee, 1610
Riggs Property Trust."  Furthermore, Max, if he had recorded the
deed, could easily have provided the Recorder of Deeds with a
notice of a name change, and a confirmatory deed, correcting the

55

name on the *Quitclaim Deed*, under D.C. Code § 42-405,[17] at the

time he recorded the deed, or within 30 days thereafter.  The

court does not find the deed defective for the misspelling of the

Trust's name.

Finally, there is the issue that Max failed to record the

*Quitclaim Deed*.  This, however, does not invalidate the transfer.

A deed conveying property will be valid, even if that deed is

never recorded as required by D.C. Code § 42-401,[18] because that

section:

---

[17]  D.C. Code § 42-405 provides in relevant part:

(a)  Any owner, as defined under § 47-802(5), of real
     property entitled to receive notices under Chapter
     8 of Title 47 shall notify the Office of Tax and
     Revenue of a name change or address change within
     30 days.
(b)  Any name change shall be evidenced by the recording
     of a confirmatory deed with the Recorder of Deeds
     and submission of supporting documents with and as
     required by the Recorder of Deeds relating to the
     applicable property.

[18]  D.C. Code § 42-401 provides:

Any deed conveying real property in the District, or
interest therein, or declaring or limiting any use or
trust thereof, executed and acknowledged and certified as
provided in §§ 42-101, 42-121 to 42-123, 42-306, and
42-602 and delivered to the person in whose favor the
same is executed, shall be held to take effect from the
date of the delivery thereof, except that as to creditors
and subsequent bona fide purchasers and mortgagees
without notice of said deed, and others interested in
said property, it shall only take effect from the time of
its delivery to the Recorder of Deeds for record.

deals with acknowledgment, certification, and recordation
as protections for "creditors and subsequent bona fide
purchasers,' . . . [t]hose requirements do not bar the
operation of a signed, sealed, and delivered deed against
parties and their assignees.

*Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 425 (D.C. 2006)

(quoting *Clay Props., Inc. v. Wash. Post Co.*, 604 A.2d 890, 894

(D.C. 1992) (en banc) and *Munsey Trust Co. v. Alexander, Inc.*, 42

F.2d 604 (D.C. Cir. 1930)); *see also Juergens v. Urban Title

Servs., Inc.*, 533 F. Supp. 2d 64, 79 (D.D.C. 2008).

Accordingly, the court finds that under District of Columbia

law, the Property was conveyed to Max and he holds both the legal

and beneficial interests in the Property.

IV

AVOIDANCE UNDER SECTION 544

The plaintiffs contend that if a trustee was appointed in

Len's bankruptcy case, the trustee would be able to avoid the

transfer of the Property under the so called "strong arm

statute," 11 U.S.C. § 544(a)(3), because even if the Property did

pass into the possession of Max in 2010, Max failed to record the

*Quitclaim Deed*.  Section 544(a)(3) provides:

The trustee shall have, as of the commencement of the
case, and without regard to any knowledge of the trustee
or of any creditor, the rights and powers of, or may
avoid any transfer of property of the debtor or any
obligation incurred by the debtor that is voidable by
. . . a bona fide purchaser of real property, other than
fixtures, from the debtor, against whom applicable law

permits such transfer to be perfected, that obtains the
status of a bona fide purchaser and has perfected such
transfer at the time of the commencement of the case,
whether or not such a purchaser exists.

"A bona fide purchaser is one 'who acquires an interest in

property for a valuable consideration and without notice of any

outstanding claims which are held against the property by third

parties.'" *Clay Props., Inc. v. Wash. Post Co.*, 604 A.2d 890,

894 (D.C. 1992) (en banc) (quoting 6A R. Powell & P. Rohan, *The

Law of Real Property* § 904[2][b], at 82-10 (1989)).  In the

District of Columbia, a bona fide purchaser's claim over property

is superior to a nonrecorded deed conveying interest in the

property.  D.C. § 42-401.  However, "[w]hat constitutes notice

varies among states and the trustee's status under § 544(a) is

governed by state substantive law governing notice."  *Webster v.

Hope (In re Hope)*, 231 B.R. 403, 423-24 (Bankr. D.D.C. 1999).

Under District of Columbia law, a bona fide purchaser is subject

to three types of notice: actual, constructive and inquiry.  *Clay

Props.*, 604 A.2d at 895.  "A purchaser is held to be on inquiry

notice where he or she is aware of circumstances which generate

enough uncertainty about the state of a title that a person of

ordinary prudence would inquire further about those

circumstances."  *Id.*

The *Clay Props.* court recognized that mere possession would

not give rise to inquiry notice except where "such possession

[was] '*sufficiently* distinct and unequivocal *so as to put the*

*purchaser on his guard.*'"  *Id.* at 897 (quoting *Hayward v. Mayse*,

1 App. D.C. 133, 140 (1893)) (emphasis in original).  There is

thus an issue of fact as to whether a hypothetical purchaser of

the Property would have inquiry notice of Max's ownership of the

Property.  However, that is an issue of fact that must be decided

by the U.S. Bankruptcy Court for the Middle District of

Tennessee.  How a judgment regarding the right of Len's estate to

recover the Property under § 544 would affect Max's homestead

exemption in this case is an issue for another day.  The issue

before the court now is whether Max can claim the homestead

exemption over the Property, and for the reasons already stated,

the court holds that he can.

V

CONCLUSION

For the foregoing reasons, it is

ORDERED that the plaintiffs' *Objection to the Debtor's Claim*

*of Exemption* (Dkt. No. 44) is overruled.

[Signed and dated above.]

Copies to: Recipients of e-notifications of orders.